The document below is hereby signed.

Signed: January 18, 2017



S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| GEMMA CALLISTE | ) | Case Nos. 10-00685 |
| EARL CALLISTE, | ) | 13-00500 |
| | ) | (Chapter 11) |
| Debtors. | ) | **(Jointly Administered Under** |
| | ) | **Case No. 10-00685)** |
| | ) | Not for publication in |
| | ) | West's Bankruptcy Reporter. |

MEMORANDUM DECISION
RE OBJECTION TO JOHN MALACHI'S CLAIMS

Earl Calliste, one of the debtors in these jointly
administered cases, has objected to the proofs of claim filed by
John Malachi (Dkt. No. 217). The court heard evidence and
argument on November 21, 2016, and decides the issues as follows.


I

As a preliminary matter, the court will address the issue of
*res judicata*. Malachi filed a post-trial memorandum in support
of his opposition to Calliste's objection to claim (Dkt. No.
274). In that memorandum, Malachi raises for the first time the
argument that the debtor's challenges to Malachi's charging of a

15% interest rate are barred under the doctrine of *res judicata*.
In support of this argument, Malachi alleges the entry by the
Superior Court of an order in the case of *Malachi v. Calliste*, 12
CA 004666 R (RP) granting partial summary judgment in Malachi's
favor on the issue of liability as to certain loans.  That order
was not attached to any of the proofs of claim filed in this
case, it was not mentioned in the opposition to the objection to
claim filed by Malachi (Dkt. No. 218), and it was not offered
into evidence at trial as a basis for defeating the debtor's
objection to claim.  For purposes of disposing of Malachi's *res
judicata* argument, I take notice that the order Malachi is
referring to appears to be the document that was attached as an
exhibit to Malachi's *Emergency Motion for Relief of Automatic
Stay* filed in the case of Earl Calliste, Dkt. No. 8, Case No. 13-
00500.[1]

As previously summarized by this court:

> The doctrine of res judicata encompasses issue preclusion
> and claim preclusion.  *See Taylor v. Sturgell*, 553 U.S.
> 880, 128 S.Ct. 2161, 2171, 171 L.Ed.2d 155 (2008); *I.A.M.
> Nat. Pension Fund, Ben. Plan A v. Indus. Gear Mfg. Co.*,
> 723 F.2d 944, 946-47 (D.C. Cir. 1983).  Issue preclusion
> prevents a party from re-litigating an issue of law or
> fact that has already actually been decided by a court of
> valid jurisdiction, whereas claim preclusion prevents re-

---

[1] Because I reject the *res judicata* argument on the merits,
I decline to reach the question of whether I could,
alternatively, reject the argument on the grounds that Malachi
waived the argument by failing to assert it in a timely fashion
and by failing to introduce the relevant order into the
evidentiary record in this contested matter.

litigation of the same claim, regardless of whether that
re-litigation would raise the same issues. *Id.* As such,
claim preclusion prevents litigation of issues of fact or
law which should have been raised in previous litigation,
even when they were not raised. *See, e.g., Captiol Hill
Group v. Pillsbury Winthrop Shaw Pittman, LLP ("CHG")*,
574 F. Supp. 2d 143, 148 (D.D.C. 2008). "[P]reclud[ing]
parties from contesting matters that they have had a full
and fair opportunity to litigate protects their
adversaries from the expense and vexation attending
multiple lawsuits, conserves judicial resources, and
fosters reliance on judicial action by minimizing the
possibility of inconsistent decisions." *Montana v.
United States*, 440 U.S. 147, 153-54, 99 S.Ct. 970, 59
L.Ed.2d 210 (1979).


The four elements considered in a motion for claim
preclusion are: (1) an identity of parties; (2) a
judgment from a court of competent jurisdiction; (3) a
final judgment on the merits; and (4) an identity of
the cause of action.

*In re Linton Properties, LLC*, 410 B.R. 1, 11 (Bankr. D.D.C.

2009). The order, on its face and by Malachi's own description,

granted only partial summary judgment and reserved issues for

later adjudication as to all claims. Likewise, the Superior

Court did not, in its order, invoke the procedure of D.C.

Superior Court Rule of Civil Procedure 54(b) by "direct[ing] the

entry of a final judgment as to one or more but fewer than all of

the claims or parties . . . upon an express determination that

there is no just reason for delay and upon an express direction

for the entry of judgment." Accordingly, pursuant to D.C.

Superior Court Rule of Civil Procedure 54(b), the order in

question did "not terminate the action as to any of the claims or

parties, and the order . . . [was] subject to revision at any

3

time before the entry of judgment adjudicating all the claims and
the rights and liabilities of all the parties."  It is unclear
whether it would be appropriate to treat such an order as final
for purposes of *res judicata*.  *See RF Del., Inc. v. Pac. Keystone
Technologies, Inc.*, 326 F.3d 1255, 1262 (Fed. Cir. 2003)
(interlocutory orders of Virginia district court granting partial
summary judgment were "not sufficiently firm to have preclusive
effect" in subsequent patent infringement case); *Avondale
Shipyards, Inc. v. Insured Lloyd's*, 786 F.2d 1265, 1270 (5th Cir.
1986).

Even if the court were to conclude that an order for partial
summary judgment that lacks a Rule 54(b) determination of
finality by the D.C. Superior Court could be treated as final for
purposes of preclusion, such an order could only have preclusive
effect if it has not been set aside.  I take judicial notice that
on July 15, 2016, the D.C. Superior Court case was dismissed for
want of prosecution after no parties appeared for a status
hearing.  The electronic docket also includes a July 14, 2016
entry reflecting the filing by the parties of a stipulation of
dismissal without prejudice.  *See* D.C. Superior Court Electronic
Docket, *Malachi v. Calliste*, Case No. 2012 CA 004666 R (RP).
Thus, even if the order could otherwise have had preclusive
effect, if the dismissal of the Superior Court proceeding is
valid, the order granting partial summary judgment entered in

4

that proceeding has, in effect, been set aside and can no longer be considered final. *See* Restatement (Second) of Judgments § 13, cmt. f (1982) (acknowledging that a judgment is not deprived of finality merely because time still permits commencement of proceedings in the trial court to set aside the judgment, nor is it deprived of its finality merely because such a motion is pending, but "[t]he judgment ceases to be final if [the order] is in fact set aside by the trial court, as it would be upon the granting of a motion for a new trial."); *Knox v. Lederle Laboratories* 4 F.3d 875, 880 (10th Cir. 1993) ("[t]he order on summary judgment was set aside by the dismissal of the action without prejudice . . . . [and] [t]he order would therefore not be a final judgment for purposes of issue preclusion.") (relying on Restatement (Second) of Judgments § 13, cmt. f (1982) in concluding that the dismissal of the action caused the summary judgment order to be set aside).

To the extent Malachi sought to rely on the Superior Court order granting partial summary judgment as establishing the amount or validity of his claims in this proceeding, it was his burden to establish the preclusive effect of the order.  Malachi having failed to carry that burden, the court rejects Malachi's *res judicata* argument.

II

The debtor correctly contends that after maturity the amount

5

lent under each unpaid matured note bears interest at 6% per

annum. *See Osayande v. Momoh (In re Momoh)*, Adv. Pro. No.

14-10034, 2016 WL 270155, at *6 (Bankr. D.D.C. Jan. 20, 2016):

> In the District of Columbia, when a contract recites a
> rate of interest until maturity but is silent regarding
> the rate after maturity, the legal rate applies. *Holden
> v. Savings & Trust Co.*, 100 U.S. 72 (1879). *See also
> Brewster v. Wakefield*, 63 U.S. 118, 127 (22 How.) (1859);
> *Richards v. Bippus*, 18 App. D.C. 293, 303 (D.C.Cir.1901);
> *Sullivan v. Snell*, 8 D.C. 585 (1 MacArth.) (D.C.1874).
> Under D.C. Code § 28-3302(a), "[t]he rate of interest in
> the District upon the loan or forbearance of money,
> goods, or things in action in the absence of expressed
> contract, is 6% per annum." Accordingly, . . . the debt
> Momoh owes Osayande is [the amount owed on the maturity
> date] . . . plus interest after [the maturity date], on
> [the amount lent] at 6% per annum.

The parties should be able to compute the amount owed as of the

petition date on each unpaid note that had matured prior to the

petition date and file a proposed stipulated order in that

regard. The promissory notes did not provide for compounding of

interest. Accordingly, after the maturity date, interest runs

only on the principal amount then owed at 6% per annum; there is

no compounding of interest via the 6% interest running on the 15%

interest that had accrued as of the maturity date. *See In re

Brown*, No. 10-00777, 2011 WL 482727, at *2 (Bankr. D.D.C. 2011),

citing *Giant Food, Inc. v. Jack I. Bender & Sons*, 399 A.2d 1293,

1304 (D.C. 1979).

In at least one instance the deed of trust securing a

promissory note referred to the note as bearing interest of 15%

per annum until paid. That is too ambiguous to amount to an

amendment of the note itself, which clearly provided for interest of 15% per annum to be paid until maturity, not afterwards.

The debtor sometimes entered into a promissory note for the amount deemed necessary to satisfy a prior note (or notes) that had matured.  The debtor agrees that any error in the parties' calculating the amount owed under the prior note (or notes) that was to be included in the new note cannot be re-visited: if the parties erroneously used the pre-maturity rate of interest in calculating the amount owed to be included in the new note, it is too late to undo that error.

### III

The debtor similarly correctly contends that the notes' provision for late fees did not apply after the notes matured. Again, the parties should be able to submit an agreed order regarding late fees that have been claimed to have accrued after a currently unpaid note had matured.

### IV

The debtor contends that he has not been given full credit for the payments he made on the notes pursuant to a plan in Mrs. Calliste's bankruptcy case.  In support of this contention, Mrs. Calliste testified that she made several payments to her attorney for the purpose of making quarterly payments under her confirmed plan, and that she believed her attorney would use those funds to pay Malachi.  However, it is not clear from Mrs. Calliste's

7

testimony that the payments she made to her attorney for purposes of his making quarterly payments under her confirmed plan were exclusively intended for payment of amounts owed to Malachi. Likewise, the checks offered in support of Mrs. Calliste's testimony fail to establish that those payments were intended exclusively for the purpose of paying Malachi.  This objection is overruled.

V

The debtor's objection to claim contends that "[t]he claims assert amounts due for attorney[s'] fees that are neither reasonable nor authorized by the Notes."  The proofs of claim are prima facie evidence of their validity, Fed. R. Bankr. P. 3001(f),[2] and the notes appended to the proofs of claim are further evidence of Malachi's contractual right to claim attorneys' fees in connection with enforcement of the notes.[3]  To rebut the prima facie validity of the claims, the debtor must "come forward with some legal reason or some factual evidence to defeat the claims."  *In re Cluff*, 313 B.R. 323, 337 (Bankr. D.

---

[2]  The hearing was limited to the amounts owed as of the petition date.  Accordingly, this decision does not address such things as additional payments the Callistes made postpetition, additional interest that accrued postpetition, and attorneys' fees incurred postpetition.

[3]  In his response, Malachi relies on the language of each note offered in support of the proofs of claim, which state "If the Note is not paid promptly in accordance with its terms, the Undersigned agrees to pay all costs of collection, including reasonable attorney's fees."

Utah 2004).  The only counter-evidence offered by the debtor to challenge Malachi's claim to attorneys' fees was based upon the alleged invalidity of the notes pursuant to which those fees are claimed.  As to those notes that the debtor has successfully shown are unenforceable, the debtor has likewise carried his burden to show that Malachi is not entitled to attorneys' fees under those notes.  As to those notes that the debtor has not shown to be unenforceable, however, the debtor has offered no evidence to rebut the prima facie validity of the amount of fees claimed.  The court acknowledges that the debtor has, in his case-in-chief, successfully presented evidence showing error in some of the amounts asserted under the proofs of claim, and this shifted the ultimate burden to Malachi to prove the correctness of such amounts.  Nevertheless, the shifting of the burden to Malachi that occurred when the debtor offered evidence rebutting the prima facie validity of Malachi's claims ought to apply only to those aspects of the proof of claim as to which the debtor identified a legitimate dispute.  I find that the debtor's general objection to the attorneys' fees on the basis of reasonableness, unsupported by evidence or argument other than the sweeping challenge to the validity of the underlying notes, was insufficient to rebut the prima facie validity of the amount of attorneys' fees claimed under the enforceable notes.

9

VI

The debtor contends that some of the loans violated the D.C.

Loan Shark Act, D.C. Code § 26-901, *et seq.* (2001), which

provides:

> (a) It shall be unlawful and illegal to engage in the
> District of Columbia in the business of loaning money
> upon which a rate of interest greater than 6% per annum
> is charged on any security of any kind, direct or
> collateral, tangible or intangible, without procuring
> license; and all persons, firms, voluntary associations,
> joint-stock companies, incorporated societies, and
> corporations engaged in said business shall pay a license
> tax of $500 per annum to the District of Columbia.  No
> license shall be granted to any person, firm, or
> voluntary association unless such person and the members
> of any such firm or voluntary association shall be bona
> fide residents of the District of Columbia, and no
> license shall be granted for a period longer than 1 year,
> and no license shall be granted to any joint-stock
> company, incorporated society, or corporation unless and
> until such company, society, or corporation shall, in
> writing and in due form, to be first approved by and
> filed with the Mayor of the District of Columbia, appoint
> an agent, resident in the District of Columbia, upon whom
> all judicial and other process or legal notice directed
> to such company, society, or corporation may be served.
> And in the case of death, removal from the District, or
> any legal disability or disqualification of any such
> agent, service of such process or notice may be made upon
> the Director of the Department of Licenses, Investigation
> and Inspections of the District of Columbia.

In turn, § 26-912 provides exceptions as follows:

> (a) No provision of this chapter shall apply with
> respect to any loan, or to the making of any loan:
> > (1) To any corporation which is unable to plead
> > any statutes against usury in any action;
> > (2) Repealed;
> > (3) Secured on real estate located outside of the
> > District of Columbia;
> > (4) To a borrower residing, doing business, or
> > incorporated outside of the District of Columbia;
> > or

10

(5) Greater than $25,000

The D.C. Loan Shark Act "is not a usury statute but rather a licensing act, imposing restrictions on the lending of sums of money on personal security." *Rivera v. Schlick*, 887 A.2d 492, 497 (D.C. 2005). It is part of a "comprehensive code for the business of lending money in the District of Columbia . . . ." and "[e]very consideration of public policy suggests that a contract made in violation of the Loan Shark Law should be unenforceable." *Hartman v. Lubar*, 133 F.2d 44, 45 (D.C. Cir. 1942). Indeed, if a loan covered by this Act is made "by one who was engaging in the business of lending money in violation of the law, and if the loan was made in the course of that business, then it constitute[s] an illegal contract." *Id.*

### A.
### Malachi was engaged in the business of loaning money in the District of Columbia.

The D.C. Loan Shark Act makes it "unlawful and illegal to engage in the District of Columbia in the business of loaning money upon which a rate of interest greater than 6% per annum is charged on any security of any kind, direct or collateral, tangible or intangible, without procuring license . . . ." D.C. Code § 26-901(a). It is undisputed that all of the loans at issue in this proceeding charged an interest rate in excess of 6% and are secured by real property in the District of Columbia. It is likewise undisputed that Malachi was not licensed to engage in

11

the business of loaning money in the District of Columbia.

Putting aside for the moment the question of whether any of the

loans at issue fall within an exception to the statute under D.C.

Code § 26-912,[4] to determine whether the statute has any

applicability to the loans in question, the court must first

determine whether Malachi was engaged in the business of loaning

money within the meaning of the statute.[5]

_____

[4]  The only exception of any relevance in this proceeding is
set forth in D.C. Code § 26-912(a)(5), which exempts loans for
more than $25,000 from the D.C. Loan Shark Act.  There is no
contention that Calliste did not reside in the District of
Columbia during the relevant time frame, *see* D.C. Code § 26-
912(a)(4), and it is conceded that all of the loans at issue are
secured by deeds of trust on real property located in the
District of Columbia.  *See* D.C. § 26-912(a)(3).

[5]  In his post-trial brief, Malachi contends that the debtor
is not a person protected under the D.C. Loan Shark Act, and then
goes on to cite a case for the proposition that usury laws are
intended to "protect desperately poor people from the
consequences of their own desperation."  Post-trial Br. at 8-9
(Dkt. No. 274) (quoting *Browner v. District of Columbia*, 549 A.2d
1107 (D.C. 1988) (citing *Schneider v. Phelps*, 41 N.Y.2d 238, 243,
391 N.Y.S.2d 568, 571, 359 N.E.2d 1361, 1364-65 (1977)).  The
D.C. Loan Shark Act is not a usury statute, but rather a
licensing statute, and serves a different, albeit related,
purpose of regulating who can make loans of a certain character
in the District of Columbia. Contrary to the implication of
Malachi's post-trial brief, neither the Act, nor the District's
usury statute for that matter, requires that the borrower on the
loan be destitute and the court rejects that argument
accordingly.

D.C. Municipal Regulation Title 16, § 299,[6] governing money lending, defines "[e]ngaged in the business of loaning money" as follows:

> [T]he holding out in the District of Columbia, by the maintenance of a place of business in the District of Columbia or in any other manner, that a loan or loans of money may be effected by or through the person so holding out, plus the performance in the District of Columbia by that person of one or more acts which result in the making or in the collection of a loan of money.

*See also Chen v. Bell-Smith*, 768 F. Supp.2d 121, 146 (D.D.C. 2011) (relying on D.C. Mun. Regs. Tit. 16, § 299's definition of "engaged in the business of loaning money" when deciding a claim brought under the D.C. Loan Shark Act).   Under this broad definition, the court easily concludes that Malachi was engaged in the business of loaning money in the District of Columbia. The evidence, including the testimony of Malachi and Calliste, shows that Malachi held himself out to Calliste as a source of money on multiple occasions, and that he likewise engaged in acts

---

[6]   D.C. Code § 26-911 (2001) provides that "[t]he enforcement of this chapter shall be intrusted to the Mayor of the District of Columbia, and the Council of the District of Columbia is hereby authorized and empowered to make all rules and regulations necessary in its judgment for the conduct of such business and the enforcement of this chapter in addition hereto and not inconsistent herewith."   Chapter 2 of Title 16 of the D.C. Municipal Regulations governs money lending in the District of Columbia, and Chapter 9 of Title 26 of the D.C. Code governs money lenders and licenses.   Thus, to the extent D.C. Mun. Regs. Tit. 16 are not inconsistent with D.C. Code § 26-901, *et seq.*, it is appropriate to rely on definitions set forth in the D.C. Mun. Regs. Tit. 16 to give meaning to terms left otherwise undefined in D.C. Code § 26-901, *et seq.*

that resulted in the making of loans to and the collection of
loans from Calliste.[7]  Thus, I conclude that, under the definition
of "engaged in the business of loaning money" found in D.C. Mun.
Regs. Tit. 16, § 299, Malachi was engaged in the business of
loaning money.

Even without the benefit of a controlling definition such as
that supplied by the D.C. Municipal Regulations, I would still
conclude that Malachi was engaged in the business of loaning
money in the District of Columbia.  Courts faced with the
question of whether a party was engaged in the business of
loaning money look at a variety of different factors, including
the number of loans made by the lender, whether the loans are all
related to the same or different transactions, the number of
different borrowers the lender contracted with, the degree to
which the lender is directly involved in making the loan, and the
degree to which the lender is responsible for collection efforts.
*See Rivera v. Schlick*, 887 A.2d 492, 498 (D.C. 2005) (finding
that a lender was not engaged in the business of lending money

---

[7]  Whether the same can be said about Malachi's loans to
individuals other than Calliste in the District of Columbia is
less clear.  Malachi testified that he made three loans in the
District of Columbia to individual(s) other than Calliste, but
how that came to pass and whether Malachi held himself out as a
lender to that individual or individuals, is not in the record.
To the extent the court relies on the Municipal Regulation's
definition of what it means to be engaged in the business of
loaning money, however, it is enough that Malachi held himself
out in that manner and lent money just to Calliste.

when all of the loans he made were to the same person and "they all arose from a single transaction and had the sole purpose of completing renovations on a single property."); *Zirkle v. Daly*, 54 F.2d 455 (App. D.C. 1931) (non-resident making occasional loans on real estate in the District of Columbia was not in the business of loaning money within the meaning of the D.C. loan shark law). *See also Dane v. Brown*, 70 F.2d 164, 165 (1st Cir. 1934) (considering a New Jersey licensing statute applicable to parties "pursuing the practice of architecture," and finding it well settled that "engaging in business" and similar terms "contemplate a course of business or professional practice, and not single isolated acts arising from unusual circumstances.").

At trial, Malachi testified that he has made approximately 30 loans to the debtor dating back as far as 1998, and those loans have been secured by deeds of trust on at least seven different parcels of real property.  Starting sometime between 2005 and 2008, Malachi made a total of six other loans to four people other than Calliste, and three of those six loans were made in the District of Columbia.  Malachi further testified that those other borrowers were people Calliste had done business with, and that Calliste or a broker associated with Calliste had referred those other borrowers to Malachi.  Calliste, however, denied having referred any business to Malachi, and the court credits the testimony that Calliste was not involved in arranging

15

those transactions.

The scope and breadth of Malachi's lending activities support the court's conclusion that Malachi was engaged in the business of loaning money in the District of Columbia within the meaning of the D.C. Loan Shark Act. Malachi was not just underwriting a single project or extending a one-time loan under unique circumstances, but rather, he was extending funds to Calliste over a period of many years to enable Calliste's numerous real estate projects. Furthermore, Malachi's lending was not limited to his agreements with Calliste, reinforcing the court's view that Malachi's lending practices went beyond what could be explained as a one time anomaly or something other than engaging in business.

### B.
### Applicability of the
### D.C. Loan Shark Act to Malachi's loans

A loan made in violation of the D.C. Loan Shark Act is void and unenforceable. *See Hartman v. Lubar*, 133 F.2d 44 (D.C. Cir. 1942). Section 26-912 of the D.C. Loan Shark Act expressly provides, however, that "(a) No provision of this chapter shall apply with respect to any loan, or to the making of any loan: . . . (5) Greater than $25,000." *See also Poblete v. Indymac Bank*, 657 F. Supp.2d 86, 95-96 (D.D.C. 2009) (dismissing a claim brought under the D.C. Loan Shark Act on the grounds that the Act explicitly exempts from its coverage loans greater than $25,000).

16

Under the plain terms of the statute, the D.C. Loan Shark Act

does not apply to loans in excess of $25,000 and Malachi was not

required to obtain a license to make such loans.


### 1.
#### The statute of limitations does not bar Calliste from asserting the D.C. Loan Shark Act as an affirmative defense.

The D.C. Loan Shark Act has been invoked by Calliste as an

affirmative defense to the enforceability of the notes offered in

support of Malachi's proofs of claim.  Although Calliste may be

barred from seeking affirmative relief in the Superior Court, he

remains free to invoke the statute defensively in this

proceeding.  *See* Fed. R. Civ. P. 8(c) (listing illegality among

the defenses that constitute affirmative defenses).


### 2.
#### The face value of a loan may not reflect the actual amount of a loan for purposes of the D.C. Loan Shark Act.

To calculate the amount of any given loan for purposes of

determining the applicability of D.C. Code § 26-912(a)(5), the

court relies on the definitions supplied by the D.C. Municipal

Regulations.  D.C. Mun. Regs. Tit. 16 § 299.1 defines "[a]ctual

amount of the loan" as "the principal amount of money owed by a

borrower at any given time, exclusive of interest."  The

regulation goes on to provide that "interest":

> shall include, in addition to any sum of money charged
> or paid as compensation for the use of money, all

17

expenses, demands, and services of every character,
notarial fees, recording fees, and every other fee and
charge except:

(a) Premiums on insurance specifically authorized
by this chapter shall be included as interest if the
obtaining by the borrower of the insurance is a
prerequisite for the making of the loan.  Insurance,
all or any part of the premium or commission on which
insures directly or indirectly to the benefit of the
licensee, or to the benefit of any person having any
direct or indirect interest in the business of such
license, shall be deemed to have been required by the
licensee, unless the licensee shall satisfy the
Director that the insurance in fact was not so required
and that the borrower could not reasonably have
believed that it was required;

(b) on a loan of money the actual amount of which
is in excess of two hundred dollars ($200), notary fees
authorized by law for notarization of the instrument of
security and for the certificate of the licensee
required by this chapter, and the charge made by the
Recorder for recording the instrument of security; and

(c) Upon the foreclosure of the security for a
loan of money charges for attorney's and agent's fees
which do not exceed ten percent (10%) of the actual
amount of the loan found due in the foreclosure
proceeding, plus such fees and charges as are
reasonable and necessary expenses incurred for the
liquidation of the loan.

In other words, to determine the actual amount of a loan, the

D.C. Municipal Regulations instruct the court to exclude amounts

attributable to interest, with certain fees also being included

within the definition of interest.

The debtor's evidence shows that although the face value of

Malachi's replacement notes typically exceeded $25,000, a sizable

portion of the principal balance of the replacement notes was

typically attributable to unpaid interest that had accrued under

18

the instruments being released.  This raises the question of
whether interest, as defined in D.C. Mun. Regs. Tit. 16 § 299.1,
includes those "sum[s] of money charged or paid as compensation
for the use of money" that are then folded into the principal
balance of a replacement note, and if so, whether such sums are
properly excluded from consideration when determining the amount
of the loan for purposes of D.C. Code § 26-912(a)(5).  As
explained later in this opinion, because all of the notes under
which this issue arises are unenforceable based upon a finding
that they carry a taint of illegality, it is unnecessary to
resolve the issue of whether those loans could, alternatively, be
treated as loans in amounts of less than $25,000, such that the
D.C. Loan Shark Act applies directly.

3.
Loans not covered by the D.C. Loan Shark
Act may nevertheless be unenforceable if they
can be traced back to loans that violated the Act.

Several of Malachi's proofs of claim are based on promissory
notes for amounts in excess of $25,000.  For purposes of this
analysis, I treat the face value of any given note as prima facie
evidence of the amount of the loan,[8] which would appear to place

---

[8]  The debtor has put on evidence demonstrating that
portions of the obligations reflected in these renewal notes are
attributable to interest, and there is a meritorious argument to
be made that the face value of the notes does not accurately
reflect the amount of the loan for purposes of determining the
applicability of the D.C. Loan Shark Act.  Here, I assume without
deciding that the face value of the note constitutes the amount
of the loan.

19

the majority of the notes offered in support of Malachi's proofs of claim beyond the reach of the statute.

If the court determines that a loan is for an amount in excess of $25,000, however, that does not end the court's inquiry into the note's enforceability.  The evidence shows that many of the larger promissory notes upon which Malachi's proofs of claim are based can be traced to earlier notes for loans in amounts of less than $25,000, which were covered by, and in fact violated, the D.C. Loan Shark Act.  Rather than seeking to enforce and collect the full amount owed when those smaller notes reached maturity, Malachi, on many occasions, entered into new promissory notes secured by new deeds of trust, incident to which the original promissory notes and deeds of trust were released.  Over time, this cycle of releasing and renewing the notes and deeds of trust caused smaller-sized loans made by Malachi in violation of the D.C. Loan Shark Act to swell in size without the disbursement of additional funds.  Although these new loans may not be covered by the D.C. Loan Shark Act, in some instances the taint of illegality that arose under the original instrument can be traced to the renewal instrument.  The question, then, is whether this renders the renewal note unenforceable, or if the execution of these new instruments constitutes a waiver of any defense the debtor could have asserted as to the validity of the original instrument.

4.
The taint of an illegal loan can render
subsequent instruments unenforceable if the taint
of the original loan can be traced to the new instrument.

Courts have struggled with the question of if and how a

lender can remove the taint of an illegal loan by way of

ratification or reformation.  *See Indian Lake Estates v.*

*Lichtman*, 311 F.2d 776 (D.C. Cir. 1962) (finding that the

question of whether an agreement purporting to settle and

compromise preexisting contracts that were usurious could purge

the relationship of the taint of illegality presented complex

issues of fact and law not susceptible of disposition by summary

judgment).

For example, although courts acknowledge that it is possible

to purge a usurious loan by entering into a new agreement,[9] they

generally agree that a mere renewal of a usurious obligation

charging a non-usurious rate of interest on a forward-going basis

is not enough to purge the loan of its illegal taint.  As

observed in *Bowen v. Mount Vernon Sav. Bank*:

> The renewal of an instrument, when the maker knows that
> he has a defense such as fraud or duress, is commonly
> held to preclude the assertion of the defense; if the new
> contract is free from fraud and duress, it is free from
> objection.  By the same token, the renewal of an
> originally usurious note validates the transaction if all

---

[9]  As will be discussed later in this opinion, although the
D.C. Loan Shark Act is not a usury statute, it has mechanical
similarities to a usury statute insofar as it caps the interest
rate that can be charged with respect to certain loans.

> elements which made it usurious are eliminated.  But if
> the lender retains money received as usury, the usurious
> element is not eliminated; and therefore the defense of
> usury may be set up against the renewal contract.  There
> is no reason why the maker's knowledge of the usury,
> which did not validate the original contract, should
> validate the renewal.  The usury law protects the maker
> in spite of knowledge.  The same financial pressure which
> forced him to submit to usury in the first place may
> force him to renew.  To permit a mere renewal or
> extension of the contract to purge the usury would defeat
> the purpose of the statute.  Moreover the statute
> provides that payments of interest on a usurious contract
> are "taken to be payments made on account of the
> principal debt."

105 F.2d 796, 800 (D.C. 1939)(footnotes omitted).[10]  *See also In

re Feldman*, 259 F. Supp. 218, 222 (D. Conn. 1966) ("If the

original contract is usurious, a renewal or substituted contract,

particularly where usurious payments have been accepted with

unlawful intent, is also tainted and the defense of usury is

available to the borrower."). *See also Walker v. Bank of

Washington*, 44 U.S. 62, 71 (1845) ("The mere change of securities

for the same usurious loan to the same party who received the

usury, or to a person having notice of the usury, does not purge

the original illegal consideration, so as to give a right of

action on the new security.  Every subsequent security given for

_____

[10]   The D.C. Loan Shark Act "is not a usury statute but
rather a licensing act, imposing restrictions on the lending of
sums of money on personal security." *Rivera v. Schlick*, 887 A.2d
492, 497 (D.C. 2005).   Also, unlike the statute at issue in
*Bowen*, the D.C. Loan Shark Act does not specify that interest
payments on a contract that violates the Act are applied to
principal.  Nevertheless, the principles of reformation
applicable to usurious loans are instructive here.

22

a loan originally usurious, however remote or often renewed, is void.").

The loans at issue in this case, all of which charged an interest rate of 15%, are not alleged to be usurious and that distinguishes this case from *Bowen* and other cases addressing usurious loans. Nevertheless, the D.C. Loan Shark Act is part of a "comprehensive code for the business of lending money in the District of Columbia," *Hartman v. Lubar*, 133 F.2d 44, 46 (D.C. Cir. 1942), and like a usury statute, it seeks to regulate lending in a manner that, among other things, protects borrowers.[11]  *See Royall v. Yudelevit*, 268 F.2d 577, 580 (D.C. Cir. 1959) (borrowers are among the class for whose protection the statute was enacted); *Browner v. District of Columbia*, 549 A.2d 1107, 1116 (D.C. 1988) ("[t]he class of persons protected by laws proscribing usury and loan sharking consists, essentially by definition, of individuals who, as a result of their financial plight, have improvidently made agreements so unconscionable that their enforcement is unwarranted.").

It is important to note that here, although Malachi violated the D.C. Loan Shark Act by charging more interest than he was

---

[11]  Unlike the D.C. Loan Shark Act, whose purpose is regulatory in nature, the purpose of some licensing statutes is to raise revenue.  *See e.g., Wood v. Krepps*, 143 P. 691 (Cal. 1914).  In the case of such statutes, courts sometimes find that a violation of the statute warrants the imposition of a fine rather than a voiding of the contract. *Id.* at 691-92.

legally permitted to charge with respect to certain loans, it has
not been alleged that he received any interest that would qualify
as usurious. The court in *In re Parkwood, Inc.*, 461 F.2d 158
(D.C. Cir. 1971), addressed the distinction between loans that
are illegal because they are usurious from non-usurious loans
that violate the D.C. Loan Shark Act. In the case of a loan that
is usurious, the court observed, the loan would have been illegal
regardless of the identity of the lender, whereas a loan that
violates the D.C. Loan Shark Act, although illegal and
unenforceable by the lender due to the lender's failure to obtain
a license, would have been legal and enforceable had the borrower
contracted for the same lending terms with a licensed or exempt
entity. *Id.* at 169. At least partially on that basis, the
*Parkwood* court concluded that a third-party lender could
successfully remove the taint of illegality through assumption
and reformation to a 6% interest rate. *Id.* The *Parkwood* court
concluded that the defense of illegality under the D.C. Loan
Shark Act "must be limited in effectiveness to use against those
unlicensed, non-exempt lenders who actually contract for or
receive interest in excess of 6%." *Id.*

The analysis in *Parkwood*, which contemplates a third party's
ability to reform a loan that at its inception violated the D.C.
Loan Shark Act, does not help Malachi because he was the lender
on the original transactions. None of Malachi's contracts were

24

purged of their taint through assumption and reformation by a
third party, the loans were never reformed to charge an interest
rate of 6% or less, and the party who now seeks to collect on the
renewed obligations is no stranger to the original loans.  It is
unnecessary for the court to decide precisely what steps Malachi
*could have* taken to successfully purge these replacement
instruments of the taint that arose under the original
instruments.  It suffices to say that *something* was required, and
*nothing* corrective was done.  Instead, through every replacement
instrument, Malachi continued to capitalize on the interest that
was illegally charged under the original loan.  Although the
renewed notes now reflect obligations in excess of $25,000 and
that arguably brings them within an exception to the statute,[12]
the fact that the continued accrual and compounding of illegally
charged interest eventually caused the loan amounts to swell
beyond $25,000 so as to (arguably) place them beyond the
statute's reach does not constitute a "cure" of the original
taint.  Rather, it reflects the growing harm set in motion by the

---

[12]   There is a question whether the principal amount of
those loans is actually in excess of $25,000.  As I have noted
throughout this decision, the amount of the loan for purposes of
the D.C. Loan Shark Act and the face value of the note may not be
the same.  There is a strong argument to be made that, in
determining the amount of any given loan, the court should
consider only money lent and a certain limited category of fees,
and disregard any amounts traceable to interest charged.  *See*
D.C. Mun. Regs. Tit. 16 § 299.1 (defining the "[a]ctual amount of
the loan" as "the principal amount of money owed by a borrower at
any given time, exclusive of interest.").

original illegality.


                               VII

     Malachi has filed a total of nine proofs of claim in

Calliste's bankruptcy case, Claim Nos. 10 through 18 on the

court's Claims Register.  In light of the foregoing analysis, I

conclude that the notes supporting those claims fall into three

distinct categories: (1) notes that, on their face, directly

violate the D.C. Loan Shark Act (of which there is only one); (2)

notes that fall within an exception to the D.C. Loan Shark Act

and have not otherwise been shown to be unenforceable; and (3)

notes that may not directly violate the D.C. Loan Shark Act, but

are nevertheless unenforceable because they can be traced to

loans that violated the D.C. Loan Shark Act.


                               A.
            One note directly violates the D.C. Loan Shark Act.

     Proof of Claim No. 16 in the amount of $49,083.00 is based

on a promissory note in the amount of $20,000 dated October 10,

2007, secured by a deed of trust on the debtor's real property at

2245 Shannon Place SE, Washington D.C. 20020.  Malachi made this

loan in violation of the D.C. Loan Shark Act and it is thus

unenfoceable.  The court sustains the debtor's objection to

Malachi's proof of claim No. 16 in its entirety.


                               26

B.
Several notes are not covered by the D.C. Loan Shark Act
and have not otherwise been shown to be unenforceable.

1.
Proof of Claim No. 11

Proof of Claim No. 11 is a claim in the amount of

$121,958.00, and relates to a note dated September 28, 2005, in

the principal amount of $45,000 and secured by a deed of trust on

the debtor's real property at 2247 Shannon Place S.E., Washington

D.C. 20020.  The proof of claim asserts a claim for $45,000 in

principal, $73,125.00 in interest, and $3,833.00 in attorneys'

fees.  Malachi was not required to obtain a license to make a

loan of this size, and I overrule the debtor's objection to the

extent he claims the note underlying the claim is unenforceable.

2.
Proof of Claim No. 13

Proof of Claim No. 13 is a claim in the amount of $127,796.

It is based upon a note dated April 20, 2007, in the amount of

$47,000, and secured by a deed of trust on the debtor's real

property at 730 19th St. N.E., Washington D.C. 20020.  The claim

seeks $47,000 in principal, $76,963 in interest, and $3,833 in

attorneys' fees.  The debtor has failed to demonstrate the

applicability of the D.C. Loan Shark Act to this loan, which on

its face was in the amount of $47,000 and which amount was not

contradicted by the evidence.  Accordingly, I overrule the

debtor's objection that this claim is unenforceable under the

27

D.C. Loan Shark Act.

3.

Proof of Claim No. 14

Proof of Claim No. 14 is a claim in the amount of
$271,208.00 and is based upon a deed of trust dated April 20,
2007, in the amount of $115,000, and secured by a deed of trust
on the debtor's real property at 1200 Oates St., N.E. Washington
D.C. 20002.  The claim seeks $115,000.00 in principal, $152,375
in interest, and $3,833 in attorneys' fees.  Treating the face
value of the note as the amount of the loan, I conclude that this
loan is not covered by the D.C. Loan Shark Act.  Nor has the
debtor demonstrated that this note can be traced to a loan that
did violate the Act.  Accordingly, I overrule the debtor's
objection to the extent he contends this note is illegal and
unenforceable.

4.

Proof of Claim No. 17

Proof of Claim No. 17 is a claim in the amount of
$119,708.00 based upon a note dated September 28, 2005, in the
amount of $45,000, and secured by the debtor's real property at
2245 Shannon Place, S.E. Washington D.C. 20020.  This loan is for
an amount that exceeds the $25,000 threshold and the D.C. Loan
Shark Act does not apply.  Likewise, the debtor has failed to
show that the instrument can be traced to an illegal loan or that
the face value of the instrument does not reflect the amount of

the loan.   Accordingly, I overrule the debtor's objection to this
claim to the extent he contends the note is illegal or
unenforceable under the D.C. Loan Shark Act.

5.

Proof of Claim No. 18

The basis for Proof of Claim No. 18 in the amount of
$67,564.00 is a promissory note in the amount of $25,750 dated
May 22, 2006, secured by a deed of trust on the debtor's real
property at 2247 Shannon place SE, Washington D.C. 20020.   The
stated amount of the note exceeds the $25,000 threshold by $750,
but the evidence demonstrates that the amount of the note
includes a $750 fee charged by Malachi in connection with the
making of this loan.   The proof of claim is prima facie evidence
of its validity, and in asserting his objection to the proof of
claim, the burden is on the debtor to show that the claim ought
to be disallowed based upon the applicability of the D.C. Loan
Shark Act.   It follows that it is the debtor's burden to
establish that the loan was for $25,000 or less such that the
statute applies.   I conclude that the debtor has failed to
establish that the amount of the loan was less than $25,750.

Although the debtor *has* established that $750 of the amount

29

owed was attributable to some type of fee or fees,[13] the record
fails to establish the character of the fees charged, and the
court has no basis upon which to determine whether any portion of
the $750 fee ought to be treated as interest or not.  The deed of
trust is notarized, and notaries usually charge a fee.  The deed
is likewise recorded, which almost certainly required a fee.  If
the recording fee or even a nominal charge for notarization were
charged to the debtor, those charges would, under D.C. Mun. Regs.
Tit. 16 § 299.1(b), not constitute interest and would be enough
to bring the loan amount above the $25,000 mark and place it
within an exception to the D.C. Loan Shark Act.  On this record,
I cannot determine what, if any, of the $750 ought to be excluded
from the calculation of the loan amount, and the court thus
relies on the face value of the note as establishing the amount
of the loan as being $25,750.  The debtor having failed to carry
his burden to show the applicability of the D.C. Loan Shark Act
to this claim, his objection to Claim No. 18 on that basis is
overruled.

---

[13]   For example, page 3 of debtor's Exhibit No. 3 is a check
dated June 1, 2006, in the amount of $25,000 made payable to Earl
Calliste with a note in the memo line indicating 2247 Shannon.
On cross examination, Malachi conceded that his distribution to
the debtor in connection with this loan was $25,000, but he was
unable to fully clarify the basis for the $750 charge.

30

C.

Several notes have a face value in excess of
$25,000 and may not be covered by the D.C. Loan
Shark Act, but are nevertheless unenforceable due to
the taint of illegality arising under a previous loan instrument.

1.

Proof of Claim No. 10

Proof of Claim No. 10 is a claim in the amount of $78,631.00 and relates to a note dated April 20, 2007, in the amount of $33,000 and secured by a deed of trust on the debtor's real property at 732 19th St. N.E. Washington, D.C. 20020.  The amounts sought include $32,000.00 in principal, $42,798.00 in interest, and $3,833.00 in attorneys' fees.

This note can be traced to three prior notes.  First is a note dated May 16, 2002, in the principal amount of $12,000, bearing interest at the rate of 15% per annum, and secured by a related deed of trust on the debtor's real property at 732 19th St. N.E. Washington, D.C. 20020.  The May 16, 2002 loan violated the D.C. Loan Shark Act.

Second is a loan dated January 22, 2004, in the principal amount of $12,000 bearing interest at the rate of 15% per annum, and secured by a related deed of trust on the debtor's real property at 732 19th St. N.E. Washington, D.C. 20020.  This loan instrument was separate and distinct from the May 16, 2002 note and did not replace and release the May 16, 2002 note.  The January 22, 2004 loan, like the May 16, 2002 loan, violated the D.C. Loan Shark Act.

31

Third is a note dated April 27, 2005, in the principal
amount of $22,600, bearing interest at a rate of 15%, and secured
by a deed of trust on the debtor's real property at 732 19th St.
N.E. Washington D.C. 20020.  This note violated the D.C. Loan
Shark Act.  This note released and replaced the May 16, 2002 and
the January 22, 2004 notes.[14]

Finally, Malachi and Calliste entered into the April 20,
2007 note, which is the basis for Malachi's proof of claim No.
10.  The April 20, 2007 note released and replaced the April 27,
2005 note.  Malachi testified that he did not advance any new
money in consideration of the 2007 note.  The 2007 note carries
the taint of the 2005 note, which violated the D.C. Loan Shark
Act, and which itself was tainted by the illegality of the May
16, 2002 and January 22, 2004 notes, which were also illegal.  I
find that the April 20, 2007 note is unenforceable because
Malachi failed to purge the taint of illegality that is traceable
to the original instruments under which this loan was made.

---

[14]  The evidence shows that the April 27, 2005 note came
into being partially as the consequence of a March 29, 2005
transaction between the debtor and Ameriquest Mortgage Company
relating to the debtor's property at 732 19th St. N.E. Washington
D.C. 20020.  A HUD-1 settlement sheet from this transaction
reflects that, by way of this transaction, Calliste caused a
payment to be made to Malichi in the amount of $100,000.  At
least a portion of that amount was applied towards the May 16,
2002 and January 22, 2004 loans that were secured by deeds of
trust on 732 19th St. N.E.  The April 27, 2005 loan amount
represents the balance that remained due on the May 16, 2002 and
January 22, 2004 notes, less amounts credited to those
obligations by virtue of the $100,000 payment.

32

2.
Proof of Claim No. 12

Claim No. 12 is a proof of claim in the amount of $78,233,
and relates to a note dated April 20, 2007, in the principal
amount of $32,000, and secured by a deed of trust on the debtor's
real property at 16 Q St. N.W., Washington D.C. 20001.  The claim
seeks $32,000 in principal, $42,400 in interest, and $3,833 in
attorneys' fees.  The history of this obligation can be traced
back to a note dated December 17, 2004, in the amount of $20,800,
secured by a deed of trust on the debtor's real property at 16 Q
Street NW Washington D.C. 20001.  Malachi was not licensed when
he entered into the December 17, 2004 note and that loan violated
the D.C. Loan Shark Act.  The December 17, 2004 note was
eventually replaced by a note dated October 26, 2006, in the
principal amount of $28,300, also secured by a deed of trust of
that same date on 16 Q Street NW Washington D.C. 20001.  Although
Malachi's testimony was non-committal on this point, I credit the
debtor's testimony and I find persuasive the supporting evidence
showing that this October 26, 2006 note released and replaced the
December 17, 2004 note without the disbursement of additional
funds.  I likewise find that the April 20, 2007 note released and
replaced the October 26, 2006 note without the disbursement of
any additional funds.  Finally, I conclude that the principal
balance of each of the replacement notes included unpaid interest
that had accrued under the note being replaced.

33

The October 26, 2006 note was tainted by the illegality of

the December 17, 2004 note.  No steps were ever taken to purge

the taint of illegality that arose under the original loan, and

it remained part of the 2007 note.  On that basis, I conclude

that the 2007 replacement note is unenforceable.  Because I find

that the 2007 note was unenforceable based upon the taint that

arose upon the inception of the loan in 2004, it is unnecessary

to reach the question of whether, alternatively, the court could

treat the loan amount as being a loan for an amount less than

$25,000 such that it directly violates the statute.

### 3.
### Proof of Claim No. 15

Proof of Claim No. 15 is a claim in the amount of $77,720,

based upon a note dated November 2, 2005, in the amount of

$28,834.00, secured by a deed of trust on the debtor's real

property at 2219 Chester St. S.E., Washington D.C. 20020.  At

trial, Malachi testified that he was not certain that any new

funds were advanced to Calliste at the time of the making of this

loan. The evidence reflects that the November 2, 2005 note

released and replaced three prior notes: (1) a note dated October

26, 2001, in the amount of $15,000; (2) a note dated July 18,

2001, in the amount of $12,000; and (3) a note dated February 14,

2002, in the amount of $10,000.  All three of these prior notes

violated the D.C. Loan Shark Act.  The evidence supports the

debtor's position that the November 2, 2005 note served merely to

34

consolidate these three illegal loans.[15] I conclude that the
November 2, 2005 note is unenforceable because it carries the
taint of illegality of the notes it replaced.

VIII

At trial, Malachi introduced evidence of amounts Malachi
paid prepetition for such things as outstanding tax certificates
and a DCRA fine.[16]  However, these amounts were not included in
the proofs of claim, and Malachi's Exhibit J listing these
expenses was not disclosed as an exhibit when he filed his list
of exhibits on October 3, 2016, in advance of the trial.  There
is likewise no showing that Malachi disclosed in discovery that
he would be claiming such amounts.  No documentary evidence was
submitted to show that the payments were made, and the debtor was
not given a fair opportunity to prepare for trial regarding these
expenditures.

Rule 3001(c)(2)(D) governs the omission of required
information from a proof of claim, and provides that the court
may:

> (i) "preclude the [claimant] from presenting the
> omitted information, in any form, as evidence in any
> contested matter or adversary proceeding in the case,
> unless the court determines that the failure was

_____

[15]  Malachi testified that when Calliste owed more money on
a piece of property than he could pay, Malachi and Calliste would
enter into a new note and deed of trust.

[16]  He asserts that he paid $13,466.18 in expenses, with an
additional $1,009.96 in interest having accrued on that amount.

substantially justified or is harmless; or

     (ii) award other appropriate relief, including
reasonable expenses and attorney's fees caused by the
failure.

Under the circumstances, I find that the omission was not
harmless because it interfered with the debtor's ability to
prepare for trial regarding these expenditures.  On that basis,
the court could invoke Rule 3001(c)(2)(D)(i), and simply exclude
the evidence presented regarding these expenses.

    In deciding whether to simply exclude the evidence regarding
the expenses, it is instructive to consider whether I would, at
this stage in the case, permit Malachi to amend him claims to
include these amounts.  As observed in *Holstein v. Brill*, 987
F.2d 1268, 1270 (7th Cir. 1993), "[l]eave to amend should be
freely granted early in a case, but passing milestones in the
litigation make amendment less appropriate."  The bar date for
filing claims in this case was December 27, 2013, almost three
years before the court held the trial on the debtor's objection
to claim.  *See Id.* (the passing of the bar date is a significant
milestone in determining whether to permit a claim amendment).
In addition, resolving the amounts that the debtor owes Malachi
is critical before a plan can be formulated in this chapter 11
case.  The conclusion of the trial of the objection to claim is
therefore itself a critical milestone.  The debtor was entitled
to notice of the charges under Rule 3001(c)(2)(A), and permitting

the litigation to be reopened to address these expenses would
delay resolution of charges that were not declared until the
trial.  Accordingly, the court will disallow the $14,476.14 in
expenses and related interest claimed by Malachi in Exhibit J.

                              IX

     An order will follow.

                              [Signed and dated above.]

Copies to: All counsel of record.